1 Judge TERRI F. LOVE.
Defendant, Medical Center of Louisiana at New Orleans-University Campus, appeals the trial court’s judgment finding it liable for the act of medical malpractice upon Plaintiff, Delphine Price. For the following reasons we amend the judgment and as amended, we affirm.

FACTS AND PROCEDURAL HISTORY

On November 22, 1996, Plaintiff, Del-phine Price (“Ms. Price”), was admitted to Charity Hospital of New Orleans (“Charity”) for laparoscopic surgery to remove an ovarian mass. On this date, Dr. Susan Webb (“Dr. Webb”) and her assistant, Dr. Kelsey James (“Dr. James”), performed the laparoscopic surgery. After inserting a Veress needle into Ms. Price’s abdomen, *746 Dr. Webb noticed that blood had accumulated in a cul-de-sac, which is typically indicative of a bowel puncture. Thereafter, she summoned Dr. David Kaplan (“Dr. Kaplan”), a fourth year resident, to inspect and repair the bowel. Dr. Kaplan located one puncture in the bowel and “ran” the rest of the bowel, in search of a possible corresponding second puncture. Unable to locate a second puncture, Dr. Kaplan concluded the surgery. The day after the surgery, on November 23, 1996, it is alleged that Ms. 1 aPrice’s developed Adult Respiratory Distress Syndrome (“ARDS”) and became anemic. On November 27, an x-ray showed that the free air in Ms. Price’s abdomen had increased from the amount shown previously. She underwent surgery to uncover the source of her declining health. Upon surveying her bowel, it was discovered that there was a second puncture wound next to the first puncture wound that had been repaired by Dr. Kap-lan. Ms. Price remained in the hospital for twenty days following this second surgery. Plaintiff alleges that Dr. Kaplan’s malpractice caused him to improperly inspect the bowel, thereby failing to find and repair the second puncture wound. In opposition, Defendant alleges that Dr. Kaplan properly “ran” the bowel in search of the second puncture wound; however, in spite of his diligence and through no fault of his own, he was unable to locate the second puncture wound.
A medical review panel reviewed Dr. Kaplan’s actions. The three physicians on the medical review panel, Dr. Neil Wolf-son, Dr. Charles Chappius, and Dr. Richard Karlin, unanimously agreed that Dr. Kaplan failed to meet the acceptable standard of care. Sometime after the medical review panel’s decision, Dr. Karlin reconsidered his opinion and decided that Dr. Kaplan’s actions did not fall below the acceptable standard of care.
This matter went to bench trial on February 7, 2000. The trial judge found that Dr. Kaplan had committed medical malpractice and awarded Ms. Price $350,000 in general damages.
Defendant specifically alleges that the trial court erred because it: 1) applied the wrong standard of care when determining whether Dr. Kaplan’s failure to locate the second bowel perforation constituted a breach of the standard of care, 2) concluded that Ms. Price’s memory loss or cognitive difficulties were related to |sthe surgeries, 3) awarded general damages of $350,000 and 4) failed to credit defendants for the costs of the Medical Review Panel.

STANDARD OF REVIEW

It is well settled that a trial court’s findings of fact will not be disturbed unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, 1176. Thus, in order to reverse a trial court’s finding of facts, an appellate court must first determine, after reviewing the record in its entirety, that a reasonable factual basis does not exist for the finding and that the record establishes that it is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987).
I. Did the trial court apply the wrong standard of care when determining that Dr. Kaplan’s failure to locate the second bowel perforation was a breach of the applicable standard of care?
In a medical malpractice action against a healthcare provider, the patient must prove by a preponderance of the evidence that: (1) the doctor’s treatment fell below the ordinary standard of care required of physicians in his medical specialty; and (2) that the doctor’s substandard care caused the injury sustained. La. *747 R.S. 9:2794; Byrd v. State, Through Dept. of Public Safety and Corrections, 93-2765 (La.5/23/94), 637 So.2d 114. A physician’s duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. Coleman v. Deno, 99-2998 (La.App. 4 Cir. 4/25/01), 787 So.2d 446. In regards to the source of a plaintiffs ailment or injury, causation is a question of fact to which the trial court’s determinations will not be disturbed absent manifest error.
Defendant argues that the trial court failed to apply the proper standard of care because it alleges that the trial court used an “outcome-determinative” analysis in evaluating Dr. Kaplan’s actions instead of determining whether he | ¿exercised the degree of skill and care ordinarily exercised by those similarly situated. Defendant argues that the trial court simply determined that by virtue of Dr. Kaplan’s failure to find the second perforation, he must have committed malpractice. However, Defendant argues that the test is not whether Dr. Kaplan actually found the second hole, but whether he exercised the proper procedure to find the hole, regardless of whether he actually found the hole or not.
Defendant misrepresents the trial judge’s analysis in finding that Dr. Kaplan failed to meet the applicable standard of care. At trial, the physicians who testified as to the procedure required for running the bowel, stated that the proper way to do so is to take the small bowel, which is estimated to be approximately 30 feet in length, and examine it section by section on each side. Additionally, they testified, that ideally, for penetrating injuries, if a physician finds one hole, he should suspect that a second one exists. Therefore, when running the bowel, if one hole is found, the physician should be in search of a second corresponding perforation.
In this case, trial testimony indicated that the first and second perforation had actually been adjacent to one another; yet, when examining the bowel, Dr. Kaplan only located one of them. Dr. Kaplan testified that when he was called into repair the hole, he immediately located the first perforation on Ms. Price’s bowel and then, section by section, he examined the rest of the bowel, passing each section to his assistant, Dr. Bushel.[1] The trial court judge asked Dr. Kaplan why he didn’t start looking for the second hole in the immediate vicinity of the first hole before running the entire bowel. To this question, Dr. Kaplan explained that he|swanted to examine the bowel in a systematic fashion. The trial judge again reiterated this question to another one of the testifying physicians, Dr. Ruary O’Connell, as to whether it would have been more fruitful to immediately examine the area in the vicinity of the first perforation and then run the entire bowel, instead of first running the bowel from top to bottom in a systematic manner. The testimony at trial was as follows:
Court: Let me try it with you. We know because we have heard that you always look for two perforations, right?
Dr. O’Connell: In that type of injury, yes.
Court: When you find one, you repair it. Why wouldn’t you look on the other side right then?
*748 Dr. O’Connell: You would. You would always' — the area where the bowel injury occurs is the most likely site for any other injury so you would look at the bowel and then you go and start — •
Court: He repaired it and then he ran the bowel top to bottom and that always seems to me to be very strange. You got to do it but you ought to look in the vicinity of the first puncture for a second puncture it seems to me.
Dr. O’Connell: We might be getting into semantics. If I have a bowel injury, that is the piece of bowel that all my attention is put on at that time. I’m looking for another injury at that time.
Court: At that location?
Dr. O’Connell: Yes, at that location. Obviously it’s the place that you bring up. Your assistant is holding it, you extend that piece of bowel so you can get a look closer on it. That is the piece of bowel that probably gets the most attention during the operation is that one piece. Then what I would do is I would immediately go up and down and around the area, particularly in the local area where that piece of bowel might be lying adjacent to other pieces of bowel.
| fiCourt: He didn’t do that. He went • up to the top and ran the bowel down.
At the conclusion of trial, the trial judge, in revealing what went into his decision making process, elaborated upon the factors that lead him to conclude that Dr. Kaplan committed medical malpractice. His statements show that his decision was not solely based upon the fact that Dr. Kaplan failed to find the second perforation, but on the fact that he failed to meet the applicable standard of care when running the bowel. This is revealed in the following exchange with Defendant’s attorney, Mr. Armstrong, concerning Dr. Kap-lan’s testimony.
Court: Do you recall him saying that when he found this original repair, when he got down there, he took particular note of the other side?
Mr. Armstrong: That’s my recollection.
Court: That’s not mine. I wanted him to say that and he couldn’t. I don’t recall that.
Mr. Armstrong: I know that he said he flipped it.
Court: But with no more particularity than he flipped any other part of the bowel. That was my problem.
[[Image here]]
Court: If he ran the bowel so carefully, how could he miss the [second] hole?
Obviously, Defendant’s contention that the court was using an outcome-determinative analysis is incorrect. In fact, the opposite is true; it is clear from the above that the court was actually seeking evidence to support the fact that Dr. Kaplan properly ran the bowel, even though he failed to find the second perforation. Thus, the court was applying the proper standard of review — whether Dr. Kaplan exercised the degree of skill and care ordinarily exercised by those similarly situated. If the Defendant’s assessment of the court’s analysis was true, [7the court would not have made an effort to evaluate Dr. Kaplan’s procedure and would have instead only focused on the end result — that the second perforation was not located.
Defendant further stresses that the trial court erred because the physician’s actions are to be evaluated in terms of reasonableness under the circumstances then existing, not in terms of the result or in light of subsequent events. See Williams v. Dau *749 terive Hosp., 99-1935 (La.App. 3 Cir. 10/12/00), 771 So.2d 763, 766, writ denied, 2000-3107 (La.1/5/01), 778 So.2d 1144. Soteropulos v. Schmidt, 556 So.2d 276, 278 (La.App. 4 Cir.1990). Assumedly, this statement of the law is brought to light in support of the proposition that Dr. Kap-lan’s actions were reasonable and that the failure to find the second hole and Ms. Price’s resultant illnesses constituted a “subsequent event” or “result” which should have no bearing on the analysis of whether Dr. Kaplan complied with the applicable standard of care in running the bowel. This argument is flawed in that implied in the standard procedure for running the bowel is that if it is done properly, the second hole, if it exists, should be found. Thus, the alleged “subsequent event” or “result” is directly related to whether Dr. Kaplan precisely adhered to the applicable standard care in running the bowel. If he had properly examined the bowel, he would have uncovered the second perforation. We cannot separate his actions from its inevitable and unfortunate consequences in this case. Therefore, we find no merit in this assignment of error.
| SII. Did the trial court err by finding that Plaintiffs memory loss and cognitive difficulties were caused by Dr. Kap-lan’s actions?
Defendant alleges that there is no reliable evidence that links Ms. Price’s cognitive difficulties to the surgery. Dr. Susan Andrews, a clinical neuropsychologist, perceived Ms. Price’s as having a problem coming up with the correct words to use, but she did not perceive this to be a cognitive difficulty linked to the surgery. She also presented other alternatives to explain reasons for Ms. Price’s problems such as hypertension and Chronic Obstructive Pulmonary Disease. However, Dr. Kenneth Levin, a neurologist, testified to the contrary. He testified that ARDS and sepsis can contribute to cognitive difficulties. He testified that an abstract from a medical journal concerning a study reported 100% of the patients who survived ARDS had cognitive difficulties. He also stated that Ms. Price appeared to suffer fairly significant cognitive impairment, which is typically seen in patients with ARDS and septicemia.
Given two opposing viewpoints regarding the root of Ms. Price’s cognitive difficulties, the trial court was most convinced by the proposition that they were caused by the surgery. In order to find that the trial court was in error, we would have to find that there exists no factual basis in the record for the trial judge’s conclusion. See Syrie, 693 So.2d 1173 at 1176. We cannot say that in this case. Given the competing evidence presented in the record, we find no clear abuse of discretion.
III. Did the trial court err in awarding Ms. Price $350,000 for general damages?
The standard of review to determine whether a trial court erred in awarding damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). The initial inquiry is whether the award for the particular injuries and their |fleffects under the particular circumstances on the particular injured person is a clear abuse of the “much discretion” of the trier of fact. When the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances, the appellate court should increase or reduce the award. Muse v. Dunbar, 97-582 (La.App. 3 Cir. 6/10/98), 716 So.2d 110. In determining whether a particular determination is reasonable, “the trier of fact, actually hearing and observing the witnesses give live testimo *750 ny, is in a better position to evaluate the credibility than a reviewing court, which at best can only study the written words of the cold record.” Burbank v. LeBeouf, 471 So.2d 980, 982 (La.App. 1 Cir.1985). Because discretion vested in the trial court is “great,” and even vast, an appellate court should rarely disturb an award of general damage. Andrus v. State Farm Mut. Auto. Ins. Co., 95-0801, p. 7 (La.3/22/96), 670 So.2d 1206, 1211.
In the instant matter, the trial judge awarded $350,000 in general damages. At present, as a result of Dr. Kap-lan missing the second perforation, Ms. Price suffered from ARDS, which is a life threatening respiratory disease, sepsis and a severe yeast infection, forcing her to endure a 20-day hospital stay. Additionally, as a result, she currently suffers from fecal incontinence and pain in her abdomen. Further still, as a result of the ARDS, she suffers from cognitive difficulties, which affect her short term memory.
Ms. Price testified that immediately following the surgery, she could not take care of herself and two of her children had to come and live in her home with her and pay her bills. Her children bought and prepared her food and also changed the bandages on her stomach wound. Since it was difficult for her to maintain the upkeep of her home while recuperating from the surgeries, she moved into a small hnone-bedroom apartment. She testified that due to her fecal incontinence, she has to wear diapers and this embarrasses her. She further expressed that she was humiliated when her family and friends found out that she had to wear diapers. Prior to the surgery, she was a strong, lively and outgoing woman; however, now, she suffers from depression and insomnia because of the way the surgery has impacted her life.
Based upon these facts and the trial court judge’s opportunity to assess these facts and the demeanor of the testifying witnesses, we cannot find that the trial court abused its discretion in awarding Ms. Price $350,000 in general damages. Therefore, we find no merit in this assignment of error.
IV. Did the trial court err by failing to credit the defendants for the costs it paid in the Medical Review Panel proceedings?
Ms. Price submitted an affidavit during the Medical Review Panel proceedings stating that she was indigent and could not afford to pay for the costs of the panel. The costs of the Medical Review Panel was $2,406.35 and this amount was paid by the defendants. Pursuant to La. R.S. 40:1299.47(I)(2)(b), if a plaintiff submits an affidavit of poverty and the defendant pays costs, the defendant is then entitled to a set-off in the event of an award in plaintiffs favor. Specifically, La. R.S. 40:1299.47(I)(2)(b) provides as follows:
The claimant shall pay the costs of the medical review panel if the opinion of the medical review panel is in favor of said claimant. However, if the claimant is unable to pay, the claimant shall swear under oath to the attorney chairman of the medical review panel that said claimant cannot afford the costs of the medical review panel as they accrue, then the costs of the medical review panel shall be paid by the health care provider, with the proviso that if the claimant subsequently receives a settlement or receives a judgment, the advance payment of the medical review panel costs will be offset.
[Emphasis added],
InPursuant to the above statute, Defendant argues that they should be entitled to offset the $2,406.35 Medical Review Panel *751 costs from the $350,000 damage amount awarded to Ms. Price.
We find that the statute is clear in that the losing party, the Defendant, is entitled to offset the costs of the medical review panel from Ms. Price’s Judgment. Accordingly, we deduct the costs of the Medical Review Panel from Ms. Price’s total award and amend the award to $347,593.65.
AMENDED, AND AS AMENDED, AFFIRMED.

. The trial court judge noted that Dr. Kap-lan’s trial testimony conflicted with his operative report. The operative report indicated that he found the first hole after running the bowel; however, at trial Dr. Kaplan testified that he immediately spotted the first perforation and then ran the bowel.