606 So.2d 83 (1992)
Emily Cecile CHARPENTIER, Plaintiff-Appellant,
v.
LAMMICO INSURANCE CO., et al., Defendants-Appellees.
No. 91-497.
Court of Appeal of Louisiana, Third Circuit.
October 6, 1992.
Vincent J. Saitta, Lafayette, for plaintiff-appellant.
Juneau, Judice, Marc W. Judice, Lafayette, for defendants-appellees.
Before GUIDRY and LABORDE, JJ., and SALOOM, J. Pro Tem.
GUIDRY, Judge.
In this medical malpractice case, plaintiff, Emily Cecile Charpentier, appeals a judgment dismissing her claims against Dr. Thomas Borland and his insurer, Louisiana Medical Mutual Insurance Company (LAMMICO).

FACTS
On April 16, 1984, the defendant, a board certified general surgeon, performed a cholecystectomy (removal of the gallbladder) on Ms. Charpentier. She had been referred to Dr. Borland by Dr. Jose Mata, a general practitioner, who had performed several diagnostic tests on the plaintiff for complaints *84 of severe abdominal pain. The tests revealed the presence of cholelithiasis (gallstones) and Dr. Mata recommended surgical removal of the gallbladder. The surgery performed by Dr. Borland was initially planned to involve two separate procedures, the cholecystectomy and a gastric partition procedure, commonly known as "stomach stapling", to control Charpentier's obese condition. At her initial visit, Charpentier inquired about and requested that Dr. Borland perform the gastric partition in addition to the gallbladder removal. During the gallbladder procedure, Dr. Borland mistakenly severed and removed a small section of the common hepatic/common bile duct.[1] There is no dispute that the severance and removal of a portion of this common duct is not part of the cholecystectomy surgical procedure. During the surgery, the defendant, upon realizing that a small section of the common hepatic duct had been severed, performed a Roux-en-Y choledochojejunostomy, a corrective procedure to reconstruct the common bile duct. Because of the injury to the common bile duct and the resulting complications, Dr. Borland did not perform the gastric partition procedure. After an uneventful recovery period, Charpentier was released from the hospital on April 23, 1984.
On May 30, 1984, during Charpentier's third postoperative visit to Dr. Borland, she complained of gray stools and was visibly jaundiced.[2] Dr. Borland was concerned that the anastomosis, the reconnection point of the common bile duct with the intestine, was obstructed. He recommended she undergo blood tests to determine the extent of her complications, but she refused. On her June 11, 1984 visit, Charpentier was more jaundiced than before, and Dr. Borland suspected that bile was being secreted into her bloodstream. The next day, she was readmitted to the hospital for a three day stay. Upon consultation with Dr. Oscar Alvarez, Dr. Borland decided to treat the condition conservatively, using antibiotics as opposed to performing exploratory or corrective surgery. Charpentier was also reluctant to undergo another surgical procedure.
Charpentier's condition worsened to the point that, on July 9, 1984, she was suffering from severe jaundice and her bilirubin level was 9.8.[3] The week before, her body temperature had reached 105 degrees. She was referred by Dr. Borland to Dr. Paul Breaux in Lafayette. Dr. Breaux subsequently referred Charpentier to Dr. John Bolton of Ochsner Hospital in New Orleans. Dr. Bolton, a general surgeon, first saw her on July 11, 1984. He conducted a cholangiogram, an x-ray examination of the bile ducts using a contrast medium, which revealed blockage of the bile duct at the anastomosis. Dr. Bolton then performed a routine biliary reconstruction to correct the strictured anastomosis. Charpentier was equipped with a T-tube drain which protruded through her abdomen. The tube remained in place for approximately six months. No further medical complications resulted from this second surgery.
In 1985, plaintiff filed a complaint with the Commissioner of Insurance alleging that Dr. Borland had committed medical malpractice by failing to meet the appropriate standard of care in injuring her common bile duct. On August 11, 1986, a Medical Review Panel concluded that the evidence presented did not establish that Dr. Borland failed to meet the applicable standard of care.
On November 14,1986, plaintiff filed this suit alleging that, through his negligence *85 and lack of due care, Dr. Borland severed her common bile duct. She also alleged that, as a result of his lack of due care, she was precluded from ever undergoing the gastric partition procedure. She considered this to be a lost "last resort" in her efforts to correct or control her obesity.
At trial, Dr. Borland testified that he initially encountered difficulty in trying to remove the gallbladder from its bed. He stated that this difficulty was caused by a significant amount of scar tissue at the neck of the gallbladder in the area where the cystic duct is normally found. Additionally, he noted that Charpentier had an anatomic anomaly in the biliary system, i.e., her common hepatic/common bile duct was abnormally narrower in diameter. As a result of this anomaly, Dr. Borland thought the common duct was the cystic duct, which is partially excised along with the gallbladder in a cholecystectomy. The cystic duct is normally appreciably thinner in diameter than the common duct. He also testified that the severance of this common duct, while infrequent in occurrence, is an accepted and known risk of gallbladder surgery. A written treatise, The Gallbladder Book, which corroborated this assertion, was admitted into evidence in connection with his testimony. According to Dr. Borland, he properly guarded against the possibility of a future stricture of the biliary system by performing the corrective procedure. He testified that he met the appropriate standard of care required of a general surgeon in performing this procedure.
Drs. William Harkrider and Daniel J. Carroll, general surgeons, testified as experts on behalf of Dr. Borland. Each also served on the Medical Review Panel which reviewed this particular case. Both surgeons had each previously performed between 400 and 500 similar surgical procedures. Dr. Harkrider testified that, in his opinion, Dr. Borland did not violate the standard of care but did achieve a bad result. This result, according to Dr. Harkrider, represented a risk inherent in the surgery, and the surgery itself was not negligent. In addition, the appropriate remedial measures were taken by the defendant. He also stated that one such injury in approximately 500 surgeries is an acceptable rate. Furthermore, Dr. Harkrider testified that, in his experience, he had also misidentified the common duct as the cystic duct on several occasions.
Dr. Carroll agreed with the opinion of Dr. Harkrider. While this particular injury had not occurred during any of the cholecystectomies he had previously performed, he stated that the result was an acceptable complication which occurred despite the exercise of reasonable care by Dr. Borland. In his opinion, the defendant did not deviate from the standard of care required of general surgeons in performing this procedure.
Dr. Richard Williams, a general surgeon, testified on behalf of the plaintiff as an expert witness. Dr. Williams stated that, in his career, he had performed thousands of gallbladder removals. Dr. Borland's actions, in his opinion, fell below the appropriate standard of care in severing and excising the common hepatic/common bile duct. Dr. Williams testified that although the risk of this injury is known, it is not acceptable. He stated that, in order to meet the standard of care, Dr. Borland should have properly bared and identified the cystic duct before he cut what turned out to be the common duct. In addition, Dr. Williams opined that the defendant should have performed an operative cholangiogram to detect gallstones in Charpentier's biliary tract. In his experience, he had read of a similar case but had never actually seen such an injury.
Dr. Bolton also testified. His testimony was mostly concerned with the corrective surgical procedures he performed on Charpentier in July of 1984. He stated that he had never personally cut the common hepatic/common bile duct in over 500 such operations. However, he did not express any opinion as to whether or not Dr. Borland had met the appropriate standard of care.
In his oral reasons for judgment rendered November 29, 1990, the trial judge concluded that, as a result of an anatomic *86 anomaly, the plaintiff's common duct had an unusually small diameter which mimicked the size of the cystic duct. This fact combined with her history of chronic gallbladder problems and resulting scar tissue led to an unfortunate result, the excising of the common duct. However, the trial court concluded that Dr. Borland possessed the degree of knowledge and skill required of general surgeons and on the occasion in question used reasonable care and diligence, along with his best judgment in the application of that skill. According to the judge, the plaintiff failed to meet her burden of proving otherwise. In so concluding, the trial court expressly weighed the credibility of the medical experts who testified. The trial judge gave greater weight to the testimony of the defendant and the experts who testified on his behalf, and discounted Dr. Williams' approach as "too simplistic". Accordingly, the plaintiff's claim against Dr. Borland and his insurer was ordered dismissed.
From this judgment, plaintiff appeals urging only that the trial court erred in finding that Dr. Borland met the appropriate standard of care.

LAW
The plaintiff's burden of proof in a medical malpractice action against a physician is found in La.R.S. 9:2794(A) which provides:
"A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."
In Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991), the Supreme Court outlined the burden of proof and appellate standard of review in such cases as follows:
"In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Smith v. State through DHHR, 523 So.2d 815, 819 (La. 1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La. 1986). Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La., 1991); Smith, 523 So.2d at 822; Rosell v. ESCO, 549 So.2d 840 (La. 1989); Hastings, 498 So.2d at 720.... "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).... where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *87 Rosell v. ESCO, 549 So.2d at 844; Housley, supra." (Emphasis ours)
The law does not require perfection in medical diagnoses and treatment. On the contrary, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. Broadway v. St. Paul Insurance Co., 582 So.2d 1368 (La.App.2d Cir.1991), and the cases cited therein. When the alleged negligence of a specialist is at issue, only those qualified in that specialty may offer expert testimony and evidence of the applicable standard of care. Fox v. Our Lady of Lourdes Regional Medical Center, 550 So.2d 379 (La.App. 3rd Cir.1989), writs denied, 556 So.2d 1263 and 556 So.2d 1264 (La.1990). When the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusions on this issue will be granted great deference. It is the sole province of the factfinder to evaluate the credibility of such experts and their testimony. Arceneaux, supra; Broadway, supra.
A thorough review of the record in this case reveals that the factual conclusions of the trial court are reasonable and not manifestly erroneous. Based on the evidence and testimony presented at trial, the conclusion that Dr. Borland did not deviate from the applicable standard of care is not clearly wrong. In such situations, we are bound to defer to the factfinder's view of the evidence.
For the above and foregoing reasons, the judgment of the trial court is affirmed. All costs of these proceedings are assessed against the plaintiff.
AFFIRMED.
NOTES
[1] This duct connects the liver, which produces bile necessary for digestion, with the small intestine. The gallbladder is connected to this common duct by the cystic duct at some point midway between the liver and the small intestine. The portion of the common duct between the liver and the cystic duct is known as the common hepatic duct. The portion below the cystic duct which connects to the small intestine is known as the common bile duct.
[2] Without bile in the digestive system, stools will be gray or clay colored. The fact that Charpentier had gray stools indicated that the flow of bile into the intestine may have been obstructed.
[3] A bilirubin count measures the amount of bile in the bloodstream. A normal level is approximately 1.0. Thus, Charpentier's bilirubin count was nearly 10 times the normal count.